# Exhibit A

E-FILED IN OFFICE - YS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

**24-A-03024-6**
**4/4/2024 3:37 PM**
TIANA P. GARNER, CLERK

**IN THE SUPERIOR COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **JASON PETERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | 24-A-03024-6 |
| | ) | **Civil Action No.: _____** |
| **GET AIR STONE MOUNTAIN** | ) | |
| **LLC, MOUNTAIN EAST, LLC,** | ) | **JURY TRIAL DEMANDED** |
| **RB MANAGEMENT SERVICES,** | ) | |
| **INC., and GREGORY ANGRUM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT**

Plaintiff Jason Peterson ("Plaintiff"), states his Complaint against Defendants Get Air Stone Mountain LLC ("Get Air"), Mountain East, LLC ("Mountain East"), RB Management Services, Inc. ("RBMS") and Gregory Angrum ("Angrum") (collectively, "Defendants") as follows:

**THIS IS A PROPER RENEWAL ACTION**

1. This negligence and premises liability case arises from the events of Sunday, February 2, 2020 at an indoor trampoline park in Gwinnett County that resulted in Plaintiff, a bystander to those events, being shot by one of the participants in those events.

2. This case is, in part, a renewal pursuant to O.C.G.A. § 9-2-61 of *Jason Peterson, Cynthia Crowder, individually, and as guardian, parent and next friend of*

*L.L. a minor, and L.L, by and through her parent, L.L.,  Plaintiffs, v. Get Air Stone Mountain, LLC, Mountain East, LLC, John Doe, John Doe, individually and as officer or member, John Doe Entity, Defendants*, Civil Action No. 22-C-00560-S1, Gwinnett County State Court (the "Original Action").  A true and correct copy of the Complaint filed in the Original Action is filed herewith as Exhibit A.

3.     As of the filing of the Complaint in the Original Action, Plaintiff did not know the names of the persons involved in the events that led to Plaintiff being shot and so identified those persons, including the shooter, as "John Doe" defendants.

4.     Plaintiff subsequently learned the names of persons involved in the events that led to him being shot, including the shooter, Defendant Angrum.

5.     In connection with his role in the events that led to Plaintiff being shot, Angrum was charged with multiple felonies, including aggravated assault and possession of a firearm during the commission of a felony.  *See State of Georgia v. Angrum*, Case No. 21-B-04511-1, Gwinnett County Superior Court (the "Criminal Case").

6.     The two-year statute of limitation applicable to Plaintiff's claims was tolled by operation of law from the date of the commission of the Angrum's alleged crimes, i.e., February 2, 2020, until the prosecution of Angrum's alleged crimes became final or otherwise terminated.  *See* O.C.G.A. § 9-3-99 ("The running of the

period of limitations with respect to any cause of action in tort that may be brought by the victim of an alleged crime which arises out of the facts and circumstances relating to the commission of such alleged crime committed in this state shall be tolled from the date of the commission of the alleged crime or the act giving rise to such action in tort until the prosecution of such crime or act has become final or otherwise terminated . . . .").  Additionally, the limitations period is tolled as to *all* defendants, not only the defendant accused of committing the crime from which a plaintiff's cause of action arises.  *See Harrison v. McAfee*, 338 Ga. App. 393, 402 (2016).

7.    The Criminal Case against Angrum became final or was otherwise terminated on March 30, 2023.

8.    The two-year statute of limitation applicable to Plaintiff's tort claims did not begin to run until March 31, 2023.

9.    This action is brought within the two-year limitations period applicable to Plaintiff's claims.

10.    Where, as in this case, an action is re-filed within the limitations period, "the plaintiff may add new parties and new claims to the re-filed action . . . ." *Ward v. Dodson*, 256 Ga. App. 660, 661 (2002).  *Accord Aaron v. Jekyll Isl. – State Park Auth.,* 348 Ga. App. 332, 333 (2019); *Green v. Dep't. of Corr.*, 365 Ga. App. 592, 595 (2022).

11.   Because this action is brought within the applicable limitations period, Plaintiff is *not* required to affirmatively show that it is "not a void suit, that it is such a valid suit as may be renewed . . . ." *See, e.g., Belcher v. Folsom 258 Ga. App. 191, 192 (2002)* (in order to renew a suit *after* the expiration of the limitations period, a plaintiff must show that the former action was not void, that the renewal action is based upon substantially the same cause of action, and that the former action was not dismissed on the merits so as to bar a subsequent action).  Nevertheless, Plaintiff states: (i) the Original Action was proper, not void; (ii) all costs have been paid in the Original Action; (iii) proper and timely service of process was made in the Original Action on Defendants Get Air and Mountain East; (iv) Plaintiff's claims in the Original Action were not dismissed on the merits; and (v) Plaintiffs Crowder and L.L. in the Original Action settled and voluntarily dismissed their claims and, thereafter, Plaintiff voluntarily dismissed his claims.

12.   Plaintiff has satisfied all requirements for re-filing his claims against Defendants Get Air, Mountain East and Angrum, and, moreover, is permitted to assert new claims and add new parties in this action.

## THE PARTIES, JURISDICTION AND VENUE

13.   Plaintiff Peterson is a resident of Gwinnett County, Georgia who was injured by the wrongful actions of Defendants within Gwinnett County, Georgia.

4

14.    Defendant Get Air is a Georgia limited liability company that maintains its principal office address at 2075 West Park Place Blvd., Suite G, Stone Mountain (Gwinnett County), Georgia 30087.  Get Air's registered agent for service of process is TRUE Space, Inc., 2400 Herodian Way, Suite 224, Smyrna, Georgia 30080.

15.    Defendant Mountain East is a Georgia limited liability company. Mountain East's registered agent for service of process is National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville (Gwinnett County), Georgia 30046.

16.    Defendant RBMS is a Georgia for-profit corporation.  RBMS contracted to provide certain property management services to Mountain East for the premises at issue in this action, which is located in Gwinnett County.  RBMS's registered agent for service of process is Morris Harrison, 260 Peachtree Street, Suite 2500, Atlanta, Georgia 30303.

17.    Defendant Angrum is an individual whose last known address is 429 Village Bluff Drive, Lawrenceville (Gwinnett County), Georgia 30046.

18.    Defendants are joint tort-feasors who may be sued in the same action in any county in which one or more of them resides.  Ga. Const. art. VI, § II, para. VI; O.C.G.A. § 9-10-31(b).

19.    Defendant Mountain East is deemed to be a resident of Gwinnett County because it maintains its registered agent there.  At least one Defendant

resides in Gwinnett County and, therefore, jurisdiction and venue are proper in this Court.

## FACTUAL BACKGROUND

20.     As of the date of the shooting at issue in this case, Sunday, February 2, 2020, Defendant Mountain East owned the office park known as Mountain East Business Center, including the property located at 2075 West Park Place Blvd., Suite G, Stone Mountain, Georgia 30087 (the "Get Air Premises") and the adjacent parking area where the shooting occurred (the "Parking Lot").

21.     As of the date of the shooting at issue in this case, February 2, 2020, Defendant Get Air leased and occupied the Get Air Premises, where it operated the Get Air Trampoline Park (the "Trampoline Park"), an indoor recreation facility featuring trampolines, dodgeball, slamball, a kiddie court, a foam pit and other activities.

22.     As of the date of the shooting at issue in this case, February 2, 2020, Defendant RBMS provided certain property management services to Mountain East pursuant to a Management Agreement entered into May 24, 2018 (the "Management Agreement").  A true and correct copy of the Management Agreement is filed herewith as Exhibit B.

23.     Under the terms of the Management Agreement, RBMS assumed responsibility as the "sole and exclusive agent to maintain, operate, manage and

6

supervise the property known as Mountain East Business Center," including 2075 West Park Place Boulevard.  *See* Management Agreement, § 1 and Exhibit A thereto.

24.   Under the terms of the Management Agreement, RBMS undertook, among other things, to provide for the "safety and security of tenants and the property of both Owner [Mountain East] and tenants . . . ."  *See* Management Agreement, § 5.A.

25.   On February 2, 2020, Plaintiff planned to spend the day with his minor godson and his godson's mother (L.L. and Cynthia Crowder in the Original Action), including a visit to the Trampoline Park.

26.   Upon arriving at the office park, Plaintiff parked his car and he, L.L. and Ms. Crowder exited the car and began walking across the Parking Lot towards the entrance to the Trampoline Park.

27.   Unbeknownst to Plaintiff, at the time he arrived, a heated argument had been brewing inside the Trampoline Park between Defendant Angrum and several other people for approximately thirty minutes.

28.   Plaintiff did not know Defendant Angrum or the other people involved in the argument, and there was no personal malice between Plaintiff and any of the people involved in the argument.

29.     Even though it was a weekend and the Trampoline Park was crowded, there was no manager or assistant manager on duty.  The Get Air employees in charge that afternoon were two "shift leaders."

30.     One of the shift leaders watched as Defendant Angrum and others argued, but "put it to the side" and "didn't interfere or anything."  Neither shift leader intervened or asked them to leave.

31.     At approximately the time Plaintiff arrived, Defendant Angrum and several of the people with whom he was arguing exited the Trampoline Park and went to the Parking Lot.  There, Defendant Angrum retrieved his gun from his car.

32.     Defendant Angrum then began firing his gun, striking one of the men he had been arguing with multiple times and striking Plaintiff in the right forearm.

33.     Plaintiff ran back to his car and, after making sure L.L. and Ms. Crowder were safely inside, drove away.

34.     It was only after hearing gunfire that one of the Get Air shift leaders called the police.

35.     Police and EMS personnel met Plaintiff as he was leaving and transported him to Northside Hospital.

36.     Plaintiff required surgery to remove the bullet and to repair his forearm.

37.     Plaintiff lost feeling and movement in his fingers and was in a cast for several months.

8

38.    Plaintiff has suffered continuing injuries from the shooting, including but not limited to a loss of feeling in his fingers, tingling and pain in the arm, and scarring.

39.    Plaintiff has incurred medical expenses as a result of the injuries he sustained in the shooting.

40.    Plaintiff lost time from work as a result of the shooting, resulting in lost wages.

41.    Prior to Plaintiff being shot, there had been other violent incidents at the Trampoline Park and in the Parking Lot, including assaults, fights and, according to a Get Air shift leader, "there were times where . . . . a fight turned into, like, a huge brawl – there was just a fight here, a fight there, everybody's just all over the place."

42.    Prior to Plaintiff being shot, Get Air employees called police in response to such incidents.

43.    Prior to Plaintiff being shot, police responded to such incidents in the Parking Lot.

44.    Such incidents were sufficient to attract the attention of Defendants Get Air, Mountain East and RBMS to the dangerous conditions that resulted in Plaintiff being shot.

9

45.    Prior to Plaintiff being shot, Plaintiff had no knowledge of such incidents and had no reason to anticipate that such incidents might occur at the Trampoline Park or the Parking Lot.

46.    At all times while present at the Trampoline Park and the Parking Lot, Plaintiff exercised reasonable care for his own safety.

47.    At the time Plaintiff was shot, there were no security personnel in the Trampoline Park.

48.    At the time Plaintiff was shot, there were no security personnel in the Parking Lot.

## COUNT ONE

### PREMISES LIABILITY
### (Get Air and Mountain East)

49.    Plaintiff incorporates paragraphs 13 through 48 by reference.

50.    Defendants Get Air and Mountain East as owners or occupiers of the Get Air Premises and the Parking Lot owe invitees a non-delegable duty pursuant to O.C.G.A. § 51-1-3 to exercise ordinary care in keeping the premises and approaches safe and are liable in damages to invitees for injuries caused by their failure to do so.

51.    Plaintiff was present in the Parking Lot at the Trampoline Park because he had a business purpose there, i.e., he intended to patronize the Trampoline Park (along with L.L. and Ms. Crowder).  Plaintiff was thus an invitee of Defendants Get Air and Mountain East.

10

52. Defendants Get Air and Mountain East, and each of them, failed to exercise ordinary care for Plaintiff's safety by, among other things, failing to provide adequate security; failing to have qualified and properly trained staff present and managing the Trampoline Park; and by allowing the heated argument involving Defendant Angrum to brew for some thirty minutes prior to Plaintiff's arrival without taking appropriate measures to de-escalate the situation, such as calling 911.

53. As the direct and proximate result of these Defendants' breaches of duty, Plaintiff has suffered bodily injury resulting in damages including medical expenses, lost wages, disability, and pain and suffering, and are liable to Plaintiff therefor in an amount to be determined at trial by jury.

## COUNT TWO

### NEGLIGENCE
### (Get Air, Mountain East and RBMS)

54. Plaintiff incorporates paragraphs 13 through 48 by reference.

55. Defendants Get Air, Mountain East and RBMS, and each of them, had a duty to keep the Trampoline Park and the Parking Lot safe and free of hazards of which they were aware or should have been aware of in the exercise of ordinary care and diligence.

56. Defendants Get Air, Mountain East and RBMS, and each of them, knew or should have known of prior violent incidents at the Trampoline Park and the Parking Lot similar to the one that led to Plaintiff being shot.

11

57.    Defendants Get Air, Mountain East and RBMS, and each of them, failed to take reasonable measures to mitigate the risk of violent incidents at the Trampoline Park and the Parking Lot similar to the one that led to Plaintiff being shot.

58.    Defendants Get Air and RBMS, and each of them, allowed the heated argument involving Defendant Angrum to brew for some thirty minutes prior to Plaintiff's arrival without taking appropriate measures to de-escalate the situation, such as calling 911.

59.    Defendants Get Air, Mountain East and RBMS, and each of them, breached their duty of care to Plaintiff.

60.    As the direct and proximate result of these Defendants' breach of duty, Plaintiff was shot.

61.    As the direct and proximate result of these Defendants' negligence, Plaintiff has suffered bodily injury resulting in damages including medical expenses, lost wages, disability, and pain and suffering, and Defendants are liable to Plaintiff therefor in an amount to be determined at trial by jury.

## **COUNT THREE**

### **CONTRACTOR LIABILITY UNDER SECTION 324A**
### **OF THE RESTATEMENT (SECOND) OF TORTS**
### **(RBMS)**

62.    Plaintiff incorporates paragraphs 13 through 48 by reference.

63.    Under Georgia law, "a party rendering security services to an owner or occupier of land owes a duty of care to third parties on the bases set out in Section 324A [of the Restatement (Second) of Torts]." *Ga. CVS Pharm. v. Carmichael*, 316 Ga. 718, 740 (2023).

64.    Under Section 324A,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of the reliance of the other or the third person upon the undertaking.

*Id.* at 741 (quoting Section 324A of the Restatement (Second) of Torts).

65.    Defendant RBMS had a contractual obligation and/or voluntarily undertook to provide for the "safety and security" of tenants and their customers and invitees of the Mountain Park Business Center, including the Get Air Premises and the Parking Lot.

66.    RBMS recognized or should have recognized that the safety and security services it undertook to provide were necessary for the protection of third persons such as and including Plaintiff.

13

67. RBMS failed to exercise reasonable care to protect its undertaking, i.e., to provide safety and security services.

68. RBMS' failure to exercise reasonable care in providing safety and security services increased the risk of harm to third persons such as and including Plaintiff.

69. By contracting with Mountain East to provide safety and security services, RBMS undertook to perform the statutory duties owed by Mountain East and Get Air, as owners and/or occupiers, to exercise ordinary care in keeping the premises and approaches safe.

70. Mountain East, Get Air and/or Plaintiff relied on RBMS's undertaking to provide safety and security services, and Plaintiff was harmed as the result of RBMS' failure to provide such services.

71. RBMS breached its duties to provide safety and security services at Mountain Park Business Center.

72. As the direct and proximate result of RBMS' breach of its duties, Plaintiff was shot.

73. As the direct and proximate result of RBMS' breach of its duties, Plaintiff has suffered bodily injury resulting in damages including medical expenses, lost wages, disability, and pain and suffering, and RBMS is liable to Plaintiff therefor in an amount to be determined at trial by jury.

14

## COUNT FOUR

## NEGLIGENT TRAINING
### (Get Air)

74.     Plaintiff incorporates paragraphs 13 through 48 by reference.

75.     Get Air inadequately trained its employees, including its "shift leaders," to manage potentially violent situations at the Trampoline Park.

76.     Get Air knew that proper training was important; the Get Air Employee Handbook states that employees are to "handle any potential volatile situations, i.e., gangs, fights, criminal acts, etc." by "prevent[ing] such an incident from escalating into a situation where someone may get hurt or injured."

77.     Yet, as a result of their inadequate training, the shift leaders on duty at the Trampoline Park on February 2, 2020 allowed the heated argument involving Defendant Angrum to brew until it escalated into the shooting that injured Plaintiff.

78.     Rather than taking charge of the situation or calling the police, the shift leaders on duty that day "put it to the side" and "didn't interfere or anything" until after Plaintiff was shot.

79.     As the direct and proximate result of Get Air's failure to adequately train its employees, Plaintiff has suffered bodily injury resulting in damages including medical expenses, lost wages, disability, and pain and suffering, and Get Air is liable to Plaintiff therefor in an amount to be determined at trial by jury.

15

## COUNT FIVE

### Negligence and Gross Negligence
### (Angrum)

80.     Plaintiff incorporates paragraphs 13 through 48 by reference.

81.     All persons have a duty not to subject others to an unreasonable risk of harm.

82.     By shooting wildly in a public place, Defendant Angrum failed to exercise either ordinary care or even slight diligence for Plaintiff's safety.

83.     As a result of Angrum's negligence and/or gross negligence, he shot Plaintiff.

84.     As the direct and proximate result of Angrum's negligence and/or gross negligence, Plaintiff has suffered bodily injury resulting in damages including medical expenses, lost wages, disability, and pain and suffering, and Angrum is liable to Plaintiff therefor in an amount to be determined at trial by jury.

## COUNT SIX

### Punitive Damages
### (All Defendants)

85.     Plaintiff incorporates paragraphs 13 through 84 by reference.

86.     Defendants, and each of them, showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the

presumption of conscious indifference to consequences so as to entitle Plaintiff to an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1.

## **COUNT SEVEN**

**Attorneys' Fees and Costs of Litigation – O.C.G.A. § 13-6-11**
**(All Defendants)**

87.    Plaintiff incorporates paragraphs 13 through 86 by reference.

88.    Defendants, and each of them have acted in bad faith, been stubbornly litigious and have caused Plaintiff to undertake the unnecessary trouble and expense of hiring attorneys, entitling Plaintiff an award of the costs of litigation, including attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Plaintiff prays for the following relief:

(a)    That Plaintiff's claims be tried before a jury of 12;

(b)    That this Court enter judgment in Plaintiff's favor and against Defendants for general and special damages in an amount to be determined at trial;

(c)    That Plaintiff be awarded punitive damages to the extent allowed by law;

(d)    That Plaintiff be awarded his costs of litigation, including attorneys' fees;

(e)    That Plaintiff be awarded post-judgment interest pursuant to O.C.G.A. § 7-4-12; and

17

(f)    That Plaintiff receive such other and further relief as this Court deems just and proper.

This 4th day of April, 2024.

WILLIAMSON AND YORK, LLC

/s/ John Williamson
John Williamson
Ga. Bar No. 765190
jhw@williamsonyork.com


/s/ Chris York
Chris York
Ga. Bar No. 781180
attorneychrisyork@gmail.com


2727 Paces Ferry Road, SE
Building One, Suite 750
Atlanta, GA 30339
(678) 358-9317

Attorneys for Plaintiff

18

# EXHIBIT A

E-FILED IN OFFICE - CL
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**22-C-00560-S1**
**1/28/2022 1:03 PM**
**TIANA P. GARNER, CLERK**

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **JASON PETERSON,** | ) | |
| **CYNTHIA CROWDER,** | ) | |
| **individually, and as guardian,** | ) | |
| **parent and next friend of L.** | ) | |
| **LAWSON, a minor, and L.** | ) | |
| **LAWSON by and through** | ) | **CIVIL ACTION FILE** |
| **her parent,** | ) | |
| | ) | **NO.:** 22-C-00560-S1 |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **GET AIR STONE MOUNTAIN,** | ) | |
| **LLC, MOUNTAIN EAST, LLC,** | ) | |
| **JOHN DOE, JOHN DOE,** | ) | |
| **individually and as officer or** | ) | |
| **member, JOHN DOE ENTITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR DAMAGES

COME NOW, JASON PETERSON, CYNTHIA CROWDER, individually, and as guardian, parent and next friend of L. LAWSON, a minor and L. Lawson by and through her parent (hereinafter identified as "Plaintiffs"), and make and file this COMPLAINT FOR DAMAGES against Defendants GET AIR STONE MOUNTAIN, LLC, MOUNTAIN EAST, LLC, JOHN DOE, JOHN DOE individually and as officer, and JOHN DOE ENTITY (hereinafter identified as "Defendants") as follows:

## **<u>PARTIES AND JURISDICTION</u>**

1.

Plaintiffs are Gwinnett County, Georgia residents who have been injured by the negligent and tortious actions of Defendants within Gwinnett County, Georgia.

2.

Defendant GET AIR STONE MOUNTAIN, LLC (hereinafter "Defendant GET AIR") is a Georgia Limited Liability Company that maintains its principal office address in Gwinnett County, State of Georgia and has its principal office and transacts business within Gwinnett County, Georgia.  Defendant Stone Mountain maintains a registered agent in Clayton County, Georgia for service of process and is subject to the laws of the State of Georgia.  Defendant Get Air may be served with process at its principal office in Gwinnett County, through its registered agent located in Clayton County, Georgia and as otherwise provided by law.

3.

Defendant GET AIR committed negligence and torts against Plaintiffs causing Plaintiffs' injuries within Gwinnett County, Georgia. As a result of Defendant GET AIR'S wrongful and tortious actions in Gwinnett County, Georgia, and its location in Gwinnett County jurisdiction is properly exercised over Defendant GET AIR and venue is proper in the State Court of Gwinnett County, Georgia.

-2-

4.

Defendant MOUNTAIN EAST, LLC (hereinafter "Defendant MOUNTAIN") is a Louisiana Limited Liability Company that owns real property and has an office and/or transacts business within Gwinnett County, Georgia.  Defendant Mountain maintains a registered agent in Gwinnett County, Georgia for service of process and is subject to the laws of the State of Georgia.  Defendant Mountain may be served with process through its registered agent located in Gwinnett County, Georgia and as otherwise provided by law.

5.

Defendant MOUNTAIN committed negligence and torts against Plaintiffs causing Plaintiffs' injuries within Gwinnett County, Georgia.  As a result of Defendant Mountain's wrongful and tortious actions in Gwinnett County, Georgia, a member of Mountain residing within the State and ownership of real property within the State and Gwinnett County, jurisdiction is properly exercised over Defendant Mountain and venue is proper in the State Court of Gwinnett County, Georgia pursuant to, inter alia, O.C.G.A. § 14-2-510 (3) and (4) and the Georgia Long Arm Statute, O.C.G.A. § 9-10-90 et seq..

6.

Defendants JOHN DOE, JOHN DOE individually and as officer or member, and JOHN DOE ENTITY are individuals and/or entities that have committed

-3-

negligence, torts and/or breach of contract against Plaintiffs, were members with or partners of other Defendants and/or were fellow co-conspirators but have not yet been identified.

7.

Defendants JOHN DOE, JOHN DOE individually and as officer or member, and JOHN DOE ENTITY are residents of, conduct business in Gwinnett County, Georgia, have an office in Gwinnett County, Georgia and/or as a result of the wrongful, tortious and contractual actions of Defendants committed within Gwinnett County, Georgia, jurisdiction is properly exercised over these Defendants and venue is proper in the State Court of Gwinnett County, Georgia.

8.

Defendants GET AIR, MOUNTAIN, JOHN DOE, JOHN DOE individually and as officer, and JOHN DOE ENTITY committed negligence and torts that injured Plaintiffs in Gwinnett County, Georgia and all Defendants are jointly and severally liable to Plaintiffs.

9.

This case is not properly removable to Federal Court because, pursuant to 28 U.S.C. 1441 (b), one or more of the Defendant tortfeasors are citizens of the State of Georgia for diversity purposes, thus precluding removal.

-4-

## FACTUAL BACKGROUND

10.

On February 2, 2020, Plaintiffs were invitees at the Get Air Stone Mountain Trampoline Park owned and operated by Defendant Get Air Stone Mountain, LLC ("Get Air Premises") and Mountain East, LLC located at 2075 West Park Place Boulevard, Suite G, Stone Mountain, Georgia 30087 ("Mountain Parking Lot Premises") (hereinafter collectively identified as "Premises").

11.

While on the Premises, Plaintiffs were exiting their vehicle in the entrance parking lot of the Premises when Plaintiff Peterson was shot in the arm by a gunshot from an altercation between Get Air and Mountain invitees (the "Altercation") in the Premises parking lot.

12.

The Altercation was between individuals unrelated and unknown to Plaintiffs.

13.

The Altercation began inside of the Get Air Premises and continued from the Get Air Premises into the Mountain Parking Lot Premises where Plaintiff Peterson was shot.

14.

The bullet from the gun shot entered Plaintiff Peterson's forearm and remained lodged inside of his arm while he fled the scene in an attempt to remove Plaintiff Crowder and Minor Lawson from the scene amidst multiple gunshots in the Mountain Parking Lot Premises.

15.

Plaintiff Crowder and Minor Lawson were in the immediate view and vicinity of the multiple gunshots and the gunshot that struck Plaintiff Peterson.

16.

Defendant GET AIR was responsible for maintaining the security of the GET AIR Premises and keeping a children's play facility free from altercation.

17.

Defendant MOUNTAIN was responsible for maintaining the security of the MOUNTAIN Parking Lot Premises and free from altercation, including but not limited to, gunshots and bullet wounds to its invitees.

18.

Defendants GET AIR and MOUNTAIN were responsible for generally maintaining the Premises and ensuring safe premises and approaches of its facilities it held out for its invitees.

-6-

19.

There was no security personnel in the GET AIR Premises at the time of the incident.

20.

There was no security personnel on the MOUNTAIN Parking Lot Premises at the time of the incident.

21.

Shortly after fleeing the scene to avoid additional gunshots to Plaintiff Peterson, Plaintiff Crowder or Minor Lawson, Plaintiff Peterson was transported to Gwinnett Medical Center aka Northside Gwinnett hospital where he was treated for his gunshot injuries.

22.

The physical and mental injuries have resulted in long term and permanent damage to Plaintiffs.

23.

Plaintiffs have incurred and will continue to incur medical bills for the foreseeable future and remainder of their lives.

24.

Due to the injuries occurring while on Defendant GET AIR and MOUNTAIN'S Premises, Plaintiffs suffered and continue to suffer pain and

-7-

discomfort daily, including but not limited to, the inability to engage in regular daily activities due to loss of function and mobility of Plaintiff Peterson's arm and hand and the mental anguish and suffering of Plaintiffs for fear of another life-threatening incident.

25.

At all times relevant to this litigation, Defendant GET AIR, Defendant MOUNTAIN and/or other Defendants had exclusive ownership, possession and control over the maintenance, security and safety of the Premises, including the GET AIR Premises and the MOUNTAIN Parking Lot Premises.

<b><u>COUNT I: PREMISES LIABILITY</u></b>

26.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 25 above as fully restated.

27.

Plaintiffs were invitees of Defendants GET AIR and MOUNTAIN EAST at the time of the incident.

28.

Defendants owed a nondelegable duty of reasonable care in keeping its Premises safe for invitees such as the Plaintiffs pursuant to, including but not limited to, O.C.G.A. §51-3-1,2 and 44-7-13,14.

-8-

29.

Defendants were negligent in failing to properly secure and maintain the area where the incident occurred, in failing to diffuse and eliminate the physical and verbal altercation between its invitees, in failing to report the ongoing Altercation to law enforcement, in failing to take adequate measures to protect invitees from the hazard of a physical and verbal altercation and gunshot battle in its Parking Lot Premises, and to generally keep the Premises safe for invitees.

30.

Defendants knew or should have known that the hazard of a physical and verbal altercation, that turned into a gunshot battle, posed a danger to invitees on the Premises and Defendants should have inspected, secured, avoided, removed, or eliminated the condition.

31.

Plaintiffs did not know and could not have reasonably learned or avoided the danger posed by parking in the MOUNTAIN Parking Lot Premises of the GET AIR Premises for a children's play facility and exiting their vehicle and into the spraying gunshots from GET AIR invitees.

32.

Defendants' negligence was the proximate cause of Plaintiffs injuries and as such Defendants are liable to Plaintiffs pursuant to, including but not limited to, O.C.G.A. §51-3-1,2 and 44-7-13,14, in an amount to be determined at trial.

## COUNT II:  NEGLIGENCE

33.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 32 above as fully restated.

34.

At all times pertinent to this Complaint for Damages, Defendants owed a duty to Plaintiffs to exercise ordinary care in assuring their safety and providing a safe environment while accessing the Premises free from fights among other invitees or others on the Premises, free from being shot while on the Premises and from other unsafe circumstances.

35.

Defendants breached their duty to Plaintiffs when they permitted a verbal and physical altercation to continue inside the GET AIR Premises and continue on the MOUNTAIN Parking Lot Premises, which caused and continues to cause Plaintiffs severe trauma and pain.

36.

As a direct and proximate cause of Defendants breach of their legal duty to Plaintiffs, Plaintiffs sustained personal injuries, special damages, and general damages for which they are entitled to be compensated by Defendants in an amount to be determined at trial.

37.

As a direct and proximate result of Defendants' negligence, Plaintiffs incurred and will continue to incur medical bills and lost wages.

38.

As a direct and proximate result of the Defendants' negligence pursuant to, including but not limited to, O.C.G.A. §51-3-1,2 and 44-7-13,14, Plaintiffs will continue to suffer both physical and mental injuries and general and special damages in the future, including expenses for future medical treatment, lost wages and earning capacity, the exact amount to be proven at trial.

## COUNT III: VICARIOUS LIABILITY

39.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 38 above as fully restated.

-11-

40.

At all times relevant to this action, the individuals responsible for inspecting, securing, and maintaining the area where Plaintiff was shot, were employed by and/or acting as agent for Defendants and were acting within their scope of employment.

41.

Defendants are responsible for the conduct of these individuals under the doctrine and theory of vicarious liability, *respondeat superior*, agency or apparent agency.

## COUNT IV: NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION

42.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 41 above as fully restated.

43.

At all times pertinent to this Complaint for Damages, Defendants owed a duty to Plaintiffs to exercise ordinary care when contracting with, hiring, training, supervising, and retraining the individuals and companies performing work and services on February 2, 2020 and other dates leading up to the date of the incident.

44.

Defendants breached these duties when they allowed the hazard of a physical and verbal Altercation, despite actual and direct knowledge of the same, to remain on

-12-

the Premises which caused Plaintiffs to suffer from the physical, visual and mental impact of gunshots resulting in immediate and long-term injuries.

45.

As a direct and proximate cause of Defendants' negligence in contracting, hiring, training, supervision, and retention, Plaintiffs sustained personal injuries, special damages, and general damages for which they are entitled to be compensated by Defendants in an amount to be determined at trial.

46.

As a direct and proximate result of the Defendants conduct, Plaintiffs incurred and will continue to incur medical bills and lost wages.

47.

Plaintiffs will continue to suffer both general and special damages in the future, including expenses for future medical treatment, the exact amount to be proven at trial.

## COUNT V: NEGLIGENCE - FAILURE TO KEEP PREMISES SAFE

48.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 47 above as fully restated.

49.

At all times pertinent to this Complaint for Damages, Plaintiffs were guests and

invitees on Defendants' Premises.

50.

At all times pertinent to this Complaint for Damages, Defendants owed a duty to Plaintiffs to exercise ordinary care to keep its premises safe and to avoid harm to its invitees.

51.

At all times pertinent to this Complaint for Damages, Defendants knew or should have known that its operations subjected its consumers and invitees to an unreasonable risk of harm in, inter alia, its overall security of its Premises and its condition.

52.

Prior to the time of Plaintiffs injuries, Defendants had actual or constructive knowledge of the dangers associated with its unsafe and unsecure Premises and specifically the hazard of an ongoing physical and mental altercation that caused Plaintiffs' permanent injuries and its history of criminal activity at the Premises.

53.

Defendants' knowledge was superior to the knowledge possessed by Plaintiffs.

54.

Prior to and at Defendants Premises, Plaintiffs did not know, and could not have reasonably known, that Defendants would fail to maintain a safe environment

-14-

for its invitees.

55.

As a result of its superior knowledge, Defendants had a duty to inspect, secure, and protect and warn Plaintiffs of the potential for the hazard of physical and mental altercation and shooting on its Premises.

56.

Defendants breached their duty to Plaintiffs by failing to warn and protect Plaintiffs from the dangers associated with the negligent security and repair of its Premises.

57.

As a direct and proximate cause of Defendants breaching their duty to exercise ordinary care in keeping the premises safe, as alleged herein, Plaintiffs sustained personal injuries, special damages, and general damages and lost earnings, wages and earning capacity for which they are entitled to be compensated by Defendants in an amount to be determined at trial.

58.

As a direct and proximate result of Defendants breaching their duty to exercise ordinary care in keeping the premises safe, as alleged herein, Plaintiffs incurred and will continue to incur medical bills in an amount to be proven at trial.

-15-

59.

As a direct and proximate result of Defendants breaching their duty to exercise ordinary care in keeping the Premises safe, as alleged herein, Plaintiffs will continue to suffer both general and special damages in the future, including expenses for future medical treatment, lost wages, earnings and earning capacity, the exact amount to be proven at trial.

## COUNT VI:  SPECIAL DAMAGES

60.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 59 above as fully restated.

61.

As set forth above, Defendants have acted at least negligently.  As a direct and proximate result of Defendant's wrongful actions, Plaintiffs have been damaged and have suffered special damages, including, but not limited to, medical expenses, lost wages, loss of earning capacity and capacity to work and labor.

62.

Plaintiffs are entitled to recover their special damages, including, but not limited to, medical expenses and lost wages and earning capacity and other damages, from Defendants in an amount to be further specified and determined at trial.

## COUNT VII: RESPONDEAT SUPERIOR

63.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 62 above as fully restated.

64.

The injuries and damages to Plaintiffs were caused by the negligent acts of employees and/or agents of Defendants.

65.

At the time of this incident, the employees and/or agents of the Defendants were acting within the scope and course of their employment.

66.

The actions of the employees and/or agents of Defendants caused Plaintiffs to sustain personal injuries, special damages, and general damages for which they are entitled to be compensated by Defendants in an amount to be determined at trial.

67.

As a result of the actions of the employees and/or agents of Defendants, Plaintiffs incurred and will continue to incur medical bills in an amount to be proven at trial.

68.

As a result of the actions of the employees and/or agents of Defendants,

Plaintiffs will continue to suffer both general and special damages in the future, including expenses for future medical treatment and loss wages and earning capacity, the exact amount to be proven at trial.

69.

Defendants are liable to Plaintiffs for the actions of its employees and agents under *respondeat superior*.

## COUNT VIII: PUNITIVE DAMAGES

70.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 69 above as fully restated.

71.

Defendants showed willful misconduct, malice, fraud, wantonness, oppression or the entire want of care which would raise the presumption of conscious indifference to consequences so as to entitle Plaintiffs and the general public to punitive damages against it in accordance with O.C.G.A. § 51-12-5.1.

## COUNT IX:  COSTS OF LITIGATION

72.

Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 71 above as fully restated.

73.

Defendants have acted in bad faith, been stubbornly litigious, taken positions for which they have no substantial justification and caused Plaintiffs to suffer the unnecessary loss of time and expense.  Plaintiffs are entitled to recover their costs of litigation, to include attorney fees, from Defendants in an amount to be determined at trial.

WHEREFORE, Plaintiffs JASON PETERSON, CYNTHIA CROWDER, individually, and as guardian, parent and next friend of L. LAWSON, a minor and L. Lawson by and through her parent pray for the following relief:

a)  That Plaintiffs Complaint for Damages be heard by a jury of 12;

b)  That this Court enter a judgment in Plaintiffs' favor and against Defendants for general and special damages in an amount to be determined at trial;

c)  That this Court enter a judgment in Plaintiffs' favor against Defendants for punitive damages and for costs and fees in an amount to be determined at trial; and

d)  That this Court award such other and further action and relief as this Court deems just and proper.

[Signature on following page]

-19-

This 28th day of January, 2022.

ROZEN & ROZEN, LLP

*/s/ Adam J. Rozen*

By: _____

248 Roswell St.                              Adam J. Rozen
Marietta, GA 30060                     Ga. Bar. No. 161610
ajrozen@rozenandrozen.com     Attorneys for Plaintiffs

-20-

# EXHIBIT B

# MANAGEMENT AGREEMENT

Owner

and

# RB MANAGEMENT SERVICES, INC.
Operator

for

Atlanta, Georgia

Date: May 24 , 2018

<u>MANAGEMENT AGREEMENT</u>

THIS AGREEMENT made and entered into this 24 day of May, 2018, between
_____Mountain East, LLC_____ ("Owner"), and
RB Management Services, Inc., a Georgia corporation ("Operator").

<u>W I T N E S S E T H :</u>

In consideration of the promises and covenants herein contained, and of other good and valuable considerations, Owner and Operator agree as follows:

1.    <u>Appointment of Operator</u>
      Owner hereby appoints Operator and Operator hereby accepts appointment on the terms and conditions hereinafter provided as the sole and exclusive agent to maintain, operate, manage and supervise the property known as <u>Mountain East Business Center located in Stone Mountain, Georgia including the addresses listed in Exhibit A to this Management Agreement</u>. Said improvements, together with the land on which they are located, are hereinafter referred to as the "Property".

2.    <u>Term</u>
      The term of this Agreement shall commence on _____June 4_____, 2018, and shall continue for a __1__ year period ending _____June 3_____, 2019, unless sooner terminated as provided in Paragraph 3 below. This Agreement shall automatically renew for successive one-year terms unless Owner or Operator provides the other with written notice of intent not to renew, such notice to be effective, must be received by the other party at least forty-five (45) days prior to the expiration of the initial one year term and each successive one year term thereafter.

3.    <u>Termination</u>
      A. Notwithstanding the provisions of Paragraph 2 above to the contrary, this Agreement may be terminated, and the obligations of the parties hereunder shall there upon cease, upon the occurrence of any of the following circumstances:

            (i)    If a petition for voluntary bankruptcy, reorganization or arrangement is filed by either Owner or Operator, or if either shall make an assignment for the benefit of creditors or take advantage of any insolvency act, the other party may terminate this Agreement upon ten (10) days written notice;

            (ii)    If Operator shall fail to comply with any rule, order, determination, ordinance or law of any federal, state or municipal authority pertaining to the Property, Owner may terminate this Agreement upon ten (10) days written notice to Operator unless Operator in good faith contests the same or cures the default within said ten (10) day period; and pay all costs and expenses in relation to such default.

(iii)    If either party shall default in the performance of any of its respective duties and obligations hereunder and such default shall continue for ten (10) days after written notice from the party not in default to the defaulting party designating such default, or if such default cannot be reasonably remedied in such period, the defaulting party does not within such ten (10) day period commence such act or acts as shall be necessary to remedy the default and shall not complete such act or acts promptly, the party not in default may terminate this Agreement upon an additional ten (10) days written notice to the defaulting party;

(iv)    If Owner shall sell the Property, or upon condemnation or destruction of the Property, Owner shall have the right to terminate this Agreement on the date of such sale, condemnation or destruction upon thirty (30) days notice to Operator;

(v)    Owner or Operator may cancel this Agreement for any or no reason by submitting said cancellation in writing, providing thirty (30) days notice thereafter of termination.

B.    Within thirty (30) days after termination of this Agreement, Operator shall (i) surrender and deliver to Owner all monies of Owner in the possession or under the control of Operator, (ii) deliver to Owner as received any monies due Owner under this Agreement received by Operator after the termination of this Agreement, (iii) deliver to Owner all materials, equipment, tools, supplies, keys, contracts, documents, books, records and accounts and other materials relating to the Property in the possession of Operator, including but not limited to all leases and lease abstracts prepared by Operator, (iv) assign such existing contracts or arrangements relating to the operation and maintenance of the Property as Owner shall direct, provided Owner and/or the assignee shall agree to assume all liability of Operator thereunder (if any) occurring from and after the termination of this Agreement, and (v) furnish such information and take all such actions as Owner shall reasonably require, including a certification as to the accuracy of any materials delivered to Owner, in order to effectuate an orderly and systematic ending of the duties and activities of Operator under this Agreement.  Upon termination of this Agreement, Operator shall deliver to Owner reports or statements for the current fiscal year, or portion thereof, ending on the date of the termination of this Agreement.

4.    Compensation
   A.    Management Fee
         For Operator's services under this Agreement, Operator shall receive, on or
         before the thirtieth (30th) day of each month, a sum equal to three and one
         half percent (3.5%), minimum $▮▮▮ of the gross income received by
         Owner from the operation of the Property. As used herein, "gross income"
         shall mean all gross receipts from the Property on a cash basis, and
         without limitation shall include all rents (including escalation and
         percentage rents), service charges and parking fees, but shall not include
         any security deposits, (except to the extent such deposits are applied in
         satisfaction of monthly rental obligations of tenants), property damage
         insurance proceeds, condemnation proceeds, payments by tenants for
         leasehold improvements made to their demised premises together with
         interest thereon, abatement, reduction or refund of taxes, awards arising
         out of taking by eminent domain, discounts and dividends on insurance
         policies, proceeds from the sale, exchange, financing and refinancing of all
         or any portion of the Property, interest, amounts paid or reimbursed by
         tenants for capital repairs, late payment charges, contributed capital or
         other extraordinary, unusual or unexpected income received in connection
         with the operation of the Property.

   B.    Construction Management Fee    (Optional Service)
         Operator shall coordinate and expedite the completion of certain tenant
         construction and base building improvements, including arranging for the
         performance of and administering the construction of any capital
         improvement work to the Property, including any tenant improvement work
         for each specific lease which requires that the Landlord rather than Tenant
         be responsible for such tenant construction.  Operator shall receive a
         Construction Management Fee equal to five percent (5%) of all cost of such
         improvements and shall be payable to Operator as an expense of operation
         upon completion of such improvements.  Construction management
         services for improvements of less than $▮▮▮▮▮ shall be on a negotiated
         fee basis.

5.    Responsibilities of Operator
   A.    General
         Subject to the terms hereof, Operator is hereby charged with the sole and
         exclusive management of the Property, and shall provide Owner with the
         services customarily provided for in such instances, and shall do and
         perform any and all things reasonably necessary for the pleasure, comfort,
         service and convenience of the tenants of the Property.  Such services
         include, but are not limited to maintaining or causing to be maintained, at
         Owner's cost (except to the extent such costs are to be paid or reimbursed

by tenants), in accordance with standards acceptable to Owner, without limitation thereof, interior cleaning and janitorial service, exterior grounds and landscaping services, restroom supplies, repairs to improvements, maintenance of mechanical systems and equipment, tenant alterations and refurbishings, safety and security of tenants and the property of both Owner and tenants, and such other normal maintenance, alteration and repair work as may be reasonably advisable or necessary. Operator shall have the right to engage the services of affiliate companies of Operator with prior approval of Owner, provided the cost for any services provided by an affiliate company of Operator are at a competitive cost, equal to or less than the cost of other non-affiliated companies and providing equal or better quality services to that of other non-affiliated companies. Owner, however, reserves the right to initiate, modify, and/or approve all policy matters not specifically covered in this Agreement.

Promptly upon receipt thereof, Operator shall submit to Owner a copy of all notices or statements received with respect to the bank accounts or insurance policies respecting the Property, or received from any governmental agency, or any tenant of the Property, together with any other notices or statements received by Operator which threaten or are expected to have a material effect upon the Property or Owner; provided, however, that such submittals shall exclude copies of information bulletins, questionnaires and other similar materials of general distribution unless expected to have a material effect upon the Property or Owner.

Operator shall notify Owner promptly in writing of all significant occurrences and circumstances affecting the Property or its operations or affecting in any manner the interest of Owner in the Property.

B.    Receipt of Funds, Bank Accounts
(i)      Operator shall use its diligent efforts to collect all rents, receipts, income and security deposits and all other sums of money whatsoever (all hereinafter collectively called "Receipts") which may be due or payable to Owner in connection with the occupancy, use or enjoyment of the Property, and to account to Owner for the Receipts and to remit the same to Owner in accordance with the subsequent provisions hereof.

(ii)     Owner authorizes Operator to request, demand, collect, receive and receipt for all such rent and to recommend to Owner instituting legal proceedings for the collection thereof and for the dispossession of tenants and other persons from the Property.

(iii)    Notwithstanding the foregoing, Operator shall not employ any collection agency or other third party to seek the collection of any

delinquent account or bring suit to effect collection of any such delinquency without obtaining Owner's prior written consent.

(iv)    Operator shall deposit all Receipts in a segregated account maintained with a bank approved by Owner. No funds other than the Receipts shall be deposited in said bank account. Operator shall be entitled to withdraw funds from said bank account to pay such expenses of operation as are herein provided (including, without limitation, the compensation to Operator provided in Paragraph 4 above). Operator shall deposit the Receipts in said bank account within two (2) business days following their collection. Owner shall be entitled to withdraw any and all amounts at any time.

C.    Monthly and Annual Statements

On or before the fifteenth day of the first full calendar month after the commencement of the Term and on or before the fifteenth day of each and every calendar month following, Operator shall deliver to Owner an accounting (hereinafter called the "Monthly Statement") on Owner's standard form, or any successor thereto, or Owner approved substitute therefore, setting forth the source of the Receipts for the preceding calendar month (and fractional calendar month if the Term shall commence upon other than the first day of a calendar month), the expenses of operation, and the names of the tenants then delinquent in the payment of rents or other charges and the amount of each such delinquency. At the election of Owner, the Monthly Statement shall also include a check register indicating the name of each payee of each disbursement for the prior month, the amount of each disbursement, the check number and description of the category of the disbursement, and receipted itemized bills. Concurrently with the delivery of the Monthly Statement, Operator shall remit to Owner the excess of the Receipts over the expenses of operation for the preceding month. In the event the expenses of operation exceed the Receipts, Operator shall immediately notify Owner thereof. Notwithstanding the foregoing, Operator shall have the right to maintain petty cash funds in the maximum sum of ███████ and to make payments therefrom in a regular and normal fashion. Owner shall remit to Operator, using electronic fund transfers, funds to cover current expenses of operation. Transfers to Operator shall be completed no more than two (2) times per month and shall occur the day following Owner's receipt of Operator's request for such funds. Operator will close the accounts for the Property on or about the thirtieth (30th) of each calendar month in order to allow time for the completion and will submit the Monthly Statement by the fifteenth day of the succeeding month. Operator shall explain line item variances exceeding ten percent (10%) from monthly budgets coincident with or as soon as possible after submission of each Monthly Statement. In addition to the Monthly Statement, Operator shall also submit to Owner

on a monthly basis a written property management status letter which shall address, among other things, the physical status of the Property and the status of delinquent receivable collection efforts.

D.  **Payment of Expenses of Operation**
    Costs and expenses incurred by Operator in accordance with the provisions of this Agreement shall, unless herein specified to the contrary, be deemed to be "expenses of operation" and shall be payable by Operator in accordance with Subsection B above.

    Notwithstanding anything contained herein to the contrary, expenses of operation do not include the following unless agreed to by Owner in writing:

    (1)  any principal, interest, ground rent or other payments due under any mortgage, ground lease or other security instrument affecting the Property;

    (2)  capital improvements or special assessments;

    (3)  any general overhead expenses of Operator not specifically attributable to the Property;

    (4)  costs not included in a budget approved in advance by Owner;

    (5)  amounts paid to Operator's affiliates for services on or to the Property, to the extent that the costs of those services exceed the competitive costs for those services rendered by persons or entities of similar skill, competence and experience, other than Operator's affiliates; or

    (6)  costs that exceed amounts actually incurred and paid by Operator or that represent a profit increment that would be realized by Operator if those amounts were fully reimbursed by Owner.

E.  **Books and Records**
    Operator shall maintain at its principal office adequate and separate books and records in connection with its management and operation of the Property. Such books and records shall be kept in accordance with generally accepted accounting principles at Operator's expense. Owner shall have the right and privilege of examining said books and records at Operator's principal office at any and all reasonable times. After the end of each calendar year, Operator, upon request by Owner, shall have an annual audit of the books and records of the Property made by a firm of

certified public accountants approved by Owner, and a financial report prepared. At Owner's election, such report shall be certified to by said accountants. The reasonable expense of the annual audit shall be deemed an expense of operation. At Owner's election, said accountants shall also prepare all forms, reports and returns required by any federal, state, county or municipal authority relating to the Property.

F.     Annual Budget

(i)     Operator agrees to compile and complete a Preliminary Annual Budget for each calendar year on Owner's standard form or any successor thereto, or substitute therefore, so that said Preliminary Budget can be delivered to Owner no later than the first (1st) day of September of the preceding year. The Preliminary Budget must include the market analysis provided for in Exhibit "A", which is incorporated into this agreement by this reference. Owner shall return the Preliminary Budget with any revisions thereto so Operator can revise and deliver a Final Annual Budget to Owner no later than the first (1st) of October of the preceding year.

(ii)     Operator agrees to compile and submit to Owner for approval, no later than forty-five (45) days after commencement of this Agreement, an operating budget for the Property for that portion of the calendar year from the effective date of this Agreement to the thirty first (31) day of December of the same year.

(iii)     It is hereby understood and agreed that all information contained in the Monthly Statement, the Annual Budgets, Operator's own Receipts and Disbursements Reports or any successors thereto or substitutes therefore, for said Property and any and all other data on the said Property given to Operator by Owner is for the purpose of the management of said Property and for the internal use of Owner and Operator only and that said information as well as, any other information provided by Owner to Operator shall at all times be confined to the Operator in the absence of Owner's prior written authorization to the contrary.

(iv)     The budget shall include as a part thereof market and property analysis and rental rate recommendations. The Budget, after approval by Owner, shall be used by Operator as a guide for the actual operation of the Property and shall be subject to monthly comparisons and periodical revisions as mutually agreed to by Owner and Operator. Operator agrees to obtain the prior approval of Owner for any expenditure or expenditures that would cause a particular Budget category to be exceeded by more than ten percent (10%) or which would cause the total amount of the budgeted expenditures to be exceeded by more than five percent (5%), calculated on a year-to-date basis.

(v)    Notwithstanding the limitation of Operator's authority to incur expenditures without Owner's approval in excess of the Budget as set forth above, Operator may incur expenditures without Owner's approval to remedy any emergency that may result in imminent bodily harm or death to persons at the Property or that may result in imminent substantial diminution in the value of Property.  Operator must promptly notify Owner of any such expenditures.

G.    Insurance and Indemnity

Property and Liability Insurance.    During the term of this Agreement, Owner shall maintain public liability and property hazard insurance containing the terms and conditions specified herein.  Upon the request of Owner, Operator shall solicit at least two (2) bids per insurance policy required thereunder.  Liability insurance must include Comprehensive General and Broad Form Comprehensive General Liability  Coverages, and shall have minimum acceptable limits of █████████████████ ████████████ Combined  Single Limit.  Property insurance must include fire insurance with extended coverage, vandalism and malicious mischief, and all-risk endorsement attached in an amount  equal to at least ninety percent (90%) of replacement cost of all buildings and personal property comprising the Property.  All liability coverage for the subject Property shall name Operator as an "Additional Insured".  Owner shall receive all notices for premiums and pay such premiums as they become due.

Indemnification.    Operator shall indemnify, promptly and diligently defend and hold  Owner harmless from any and all liability incurred by Owner as a result of any act or omission of Operator outside the scope of its authority hereunder or as a result of negligent acts or willful misconduct of Operator, its employees and agents.  To the extent insurance proceeds are available pursuant to the terms of any insurance policy covering the Property, Owner shall indemnify Operator for any and all loss incurred by Operator which results from Operator's discharging its duties hereunder in compliance with this Agreement except for acts of negligence or willful misconduct, but Owner shall not indemnify Operator for any liability or loss incurred by Operator from acts which are outside the scope of Operator's duties under this Agreement or result from negligent acts or willful misconduct of Operator, its employees and agents. It is expressly understood and agreed that the foregoing provisions of this paragraph shall survive the termination of this Agreement.

H.    Taxes and Assessments

Operator shall annually make a review of, and submit a report on, all real estate and personal property taxes and all assessments affecting the Property and shall file all personal property tax returns after consulting with Owner concerning the contents thereof.  Operator shall, without

charge or reimbursement, except for out-of-pocket expenses, and upon the request of Owner, render advice and assistance to Owner in the negotiation and prosecution of all claims for the abatement or reduction of property taxes and other taxes affecting the Property and for awards for takings by eminent domain affecting the Property, but all condemnation and taxation matters shall be within the control and direction of Owner.  Operator shall pay, as an expense of operation if requested by Owner, when due all personal property taxes which Owner is obligated to pay if so directed by Owner.

I.   Compliance with Legal Requirements
Operator shall take such action as may be necessary to comply with any and all orders or requirements affecting the Property by an federal, state, county or municipal authority having jurisdiction.  Operator may cause the same to be complied with if the cost does not exceed $▮▮▮▮ without Owner's written approval; provided, however, Operator shall not take any such action if Operator or Owner is contesting any such order or requirement.  If the cost thereof exceeds ▮▮▮▮ or if the violation might expose Operator or Owner to a fine, penalty or criminal liability, Operator shall immediately communicate with Owner in person or by telephone or facsimile so that arrangements may be promptly made for compliance with such orders or requirements.  Operator shall prepare and, after obtaining the written approval of Owner, file any such reports and documents with respect to the Property as may be required by any local, state or Federal authority.

6.   Management Authority
A.   Contracts, Capital Expenditures
With the prior approval of Owner, Operator is authorized to make and enter into for the account of, and at the expense of, Owner all contracts for utilities, window cleaning, scavenger and other services, equipment leases, tenant leases, and other agreements as are required in the ordinary course of business for the operation, leasing, maintenance and service of the Property and to pay the same when due.  Operator shall make no expenditures in excess of ▮▮▮▮ for any single item or in excess of ▮▮▮▮ per annum for capital improvements or for renovation, replacement, repair or maintenance without the prior written approval of Owner, except for Budget approved items.

B.   Employment of Personnel
(i)   Operator shall select, hire at reasonable wages, supervise and discharge all personnel working at the Property.  Operator shall not discriminate against any employee or applicant for employment because of race, creed, color, sex, marital status or national origin.  Operator shall hire Owner's personnel working at the property at the direction of Owner.

(ii)     Operator shall employ a sufficient number of capable employees to enable Operator to properly, adequately, safely and economically manage, operate and maintain the Property.

(iii)     All personnel shall in every instance be deemed employees of Operator and not of Owner, and Owner shall have no right to supervise or direct such employees.  The wages, salaries and other compensation, including Social Security taxes, unemployment compensation insurance, worker's compensation and employer's liability insurance, and similar items for Operator's personnel employed at the Property, shall be paid by Operator and shall be deemed to be expenses of operation.  All fringe benefits, medical and health insurance, and group life insurance for Operator's personnel employed at the Property, shall be deemed to be expenses of operation, but such benefits and plans are subject to the approval of Owner, which approval shall not be unreasonably withheld. The terms "employee" and "personnel" shall include, without limitation, employees of a casual, temporary or part-time nature.  Notwithstanding the foregoing, the wages, salaries and other compensation, including Social Security taxes, unemployment compensation insurance, worker's compensation and employer's liability insurance of,  (i) executive personnel of Operator above the level of building manager, (ii) employees of Operator who are not employed at the Property and, (iii) employees or personnel of Owner not listed on the Budget approved by Owner shall be paid by Operator and shall not be deemed to be expenses of operation.

C.     Supplies
Operator shall, as an expense of operation, purchase such supplies and any other expendable items as are necessary to operate the Property with prior approval of Owner.  When taking bids or issuing purchase orders, Operator shall secure for the credit to Owner any discounts, commissions or rebates obtainable as a result of such purchase.

7.     General Provisions
A.     Relationship
(i)     Operator and Owner shall not be construed as joint venturers or general partners of each other and neither shall have the power to bind or obligate the other party except as set forth in this Agreement.  Operator shall act as an independent contractor for Owner for all purposes.

(ii)     Nothing herein shall deprive or otherwise affect the right of either party to own, invest in, manage or operate property or to conduct business activities which are competitive with the business of the Property.

B.     Assignment

This Agreement is not assignable by Operator without the prior written consent of Owner.

C.   Benefits and Obligations
The covenants and agreements herein contained shall inure to the benefit of, and be binding upon the parties hereto and their respective heirs, executors, successors and assigns.

D.   Notices
No notice or other communication under this Agreement is sufficient to affect any rights, remedies or obligations of a party unless the notice or communication is in writing and (as elected by the party giving the notice) is (i) personally delivered, (ii) transmitted by facsimile (with receipt acknowledgment), (iii) transmitted by a recognized courier service agreed to by the parties from time to time or (iv) transmitted by postage prepaid, certified or registered mail (with a return receipt requested, airmail if international) to the other party at the following address:

OWNER:

OPERATOR:
RB Management Services, Inc.
260 Peachtree Street, Suite 2500
Atlanta, GA 30303
Attention:  Morris Harrison

Each party may change its address by notice to the other party.

E.   Entire Agreement
This Agreement is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

F.   Severability
If any provision of this Agreement or application to any part or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstance, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

G.    Governing Laws
      This agreement shall be construed in accordance with the laws of the state
      of Georgia.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of
the day and year first above written.

OWNER:   Mountain East, LLC
WITNESS AS TO OWNER

BY: _____

ITS: _____Manger_____

OPERATOR:
WITNESS AS TO OPERATOR      RB MANAGEMENT SERVICES, INC.

BY: _____

ITS: _____

Exhibit A

Address List
Mountain East Business Center
Stone Mountain, GA 30087


2075 West Park Place Boulevard
2046 West Park Place Boulevard
2056 West Park Place Boulevard
2305 West Park Place Boulevard
2136 West Park Court
2146 West Park Court
2156 West Park Court
2166 West Park Court
2165 West Park Court
2171 West Park Court
2169 West Park Court


Initials:

Owner_____WM_____

Operator_____